**ARMSTRONG BUSINESS SERVICES, INC., et al., Appellants,**

v.

**H & R BLOCK, et al., Respondents.**

**No. WD 60348.**

Missouri Court of Appeals,
Western District.

Dec. 24, 2002.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 28, 2003.

Application for Transfer Denied
March 4, 2003.

Bernard J. Rhodes, Kansas City, for Appellants.

Karen R. Glickstein, Kansas City, for Respondent H & R Block.

John J. Allan, Clayton, MO; Jack R. Selzer, Kansas City, MO; Phillip A. Kramer and Stephen H. Rovak, St. Louis, for Respondent Amicus Curiae.

Before PAUL M. SPINDEN, P.J., ROBERT G. ULRICH and EDWIN H. SMITH, JJ.

Robert G. Ulrich, J.

This appeal involves major franchise agreements between Armstrong Business Services, Inc., et al. (Franchisees) and H & R Block, et al. (Block). Franchisees appeal the trial court's grant of summary judgment in favor of Block declaring that the major franchise agreements are contracts of indefinite duration that may be renewed only if both parties consent and that if the contracts are not renewed, they expire at the end of the current term. The judgment of the trial court is reversed in part and affirmed in part, and the case is remanded for further proceedings.

## I. Facts

Franchisees are individuals or companies operating income tax preparation businesses in various states, including Alabama, Florida, Illinois, Iowa, Michigan, New York, Oregon, Virginia, and Washington, under major franchise agreements with Block. Presently, 200 major franchise agreements are in effect between Franchisees and Block. The agreements were executed between 1973 and 1998, and all are in a standard form adopted in 1973.

Under the franchise agreements, Block grants to a franchisee the exclusive right to use its H & R Block service mark and related marks in connection with the franchisee's business of preparing income tax returns and performing related services within a specified geographic area. In return, Block collects a franchise royalty of up to 15% of the franchisee's gross receipts. Additionally, the agreements provide that Block will not compete with a franchisee in the preparation of tax returns or performance of related services within the franchise territory. If Block does perform related services within the franchise territories, a franchisee shall be entitled to receive 55% of the gross receipts from Block's performance of such services.

The franchise agreements do not contain a final expiration date. Rather, Paragraph 18 provides:

*TERM OF AGREEMENT.*

The term of this Agreement shall run for a period of five years from the date hereof, with further provisions that it shall be automatically renewed for successive periods of five years each, unless mutually terminated or terminated pursuant to paragraph 12.

Paragraph 12 permits Block to terminate the agreement at any time for "any material and substantial breach of the terms" by a franchisee. Thus, the franchise agreements provide for an initial term of five years and for automatic five-year renewals, unless terminated with the consent of the parties or for cause. All 200 agreements have consistently been renewed at least once, except for three agreements that are still in their initial terms. Paragraph 24 of the agreements provides that in the event of the termination of the agreement for any reason other than sale to Block, a franchisee shall sell and Block shall pay a fair and equitable price for the franchisee's business.

In April 1999, Franchisees sued Block for breach of contract and various other claims arising out of Block's sale of tax preparation computer software, including sales over the Internet, within the franchise territories. Block filed a counterclaim seeking a declaration that the franchise agreements were contracts of indefinite duration; that their terms may be renewed only with the consent of both parties; and that if not so renewed, the term of each of the agreements will expire at the end of the current term.

As the litigation in this case proceeded, Block notified Franchisees by letters that it would not consent to further renewals of the franchise agreements and that each agreement would, therefore, expire at the end of its current term. Block further explained that it was prepared to purchase the assets of the businesses as provided in paragraph 24 of the agreements. The letters noted the substantial deterioration of the business relationship of the parties "as we have attempted to do business in an environment characterized by rapidly changing technologies and business opportunities under agreements whose form is more than 25 years old."

Thereafter, Block filed its motion for summary judgment on its counterclaim. Franchisees also filed a motion for summary judgment on Block's counterclaim. The trial court entered an order granting summary judgment in favor of Block. It held that the case, *Preferred Physicians Mutual Management Group, Inc. v. Preferred Physicians Mutual Risk Retention Group, Inc.*, 961 S.W.2d 100 (Mo.App. W.D.1998), controlled the issue of renewal of the franchise agreements. The trial court found that franchise agreements are contracts of indefinite term; that they may be renewed only if both parties consent;

and that if the contracts are not renewed, they expire at the end of the current term. The trial court certified its order for appeal under Rule 74.01(b) finding that there is no just reason for delay. This appeal by Franchisees followed.

## II. Points on Appeal

On appeal, Franchisees claim that the trial court erred in granting summary judgment in favor of Block on its counterclaim [1] finding that the franchise agreements are contracts for indefinite duration and, thus, effectively terminable at will at the end of a five-year term. Franchisees first contend that the franchise agreements are not for an indefinite duration because the agreements expressly state that they will continue unless terminated by mutual agreement or for cause. Secondly, Franchisees contend that the trial court erred in finding the franchise agreements are for an indefinite duration because the trial court excluded extrinsic evidence showing that Block promoted the franchise agreements as agreements granting permanent and assignable franchises and that the parties have renewed the agreements hundreds of times over the past thirty years without requiring an overt expression of mutual agreement to renew. Finally, Franchisees claim that as to the franchisees holding franchises in the states of Arkansas, Illinois, Iowa, Michigan, Virginia, and Washington, the trial court erred in granting summary judgment in favor of Block to the extent that the decision was based on the application of Missouri law. They contend that the statutory laws in those states prohibit termination of the franchise agreements.

## III. Standard of Review

Appellate review of the grant of summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment will be upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.* Facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* at 376.

## IV. Choice of Law

Before deciding whether the trial court erred in declaring that the franchise agreements in this case are contracts for indefinite duration and, thus, terminable at will at the end of any five-year term, the state law that governs this issue must first be decided. The parties in this case chose

---

1. Block sought summary judgment on its counterclaim for declaratory judgment. The Declaratory Judgment Act is not invoked where an adequate remedy exists. *Preferred Physicians Mut. Mgmt. Group, Inc. v. Preferred Physicians Mut. Risk Retention Group*, 916 S.W.2d 821, 824 (Mo.App. W.D.1995). An adequate remedy exists if the plaintiff could assert the issues sought to be declared as a defense in an action brought by the defendant. *Id.* This rule is especially applicable where the issues sought to be declared have been asserted as a defense in the same litiga-

tion. *Id.* The declaratory judgment sought by Block in this case was not a defense to Franchisees' breach of contract and various other claims arising out of Block's sale of tax preparation software in the franchise territories. Rather, Block sought a declaration that the franchise agreements were contracts of indefinite duration; that their terms may be renewed only with the consent of both parties; and that if not so renewed, the term of each of the agreements will expire at the end of the current term. Thus, the Declaratory Judgment Act was properly invoked.

the law of the State of Missouri to govern their contractual rights and duties. Paragraph 22 of the franchise agreements, entitled "APPLICABLE LAW," provides, "This agreement shall be construed according to the laws of the State of Missouri; provided, however, no violation hereof shall be deemed a breach of contract if occasioned by the laws or public policy (as judicially decreed) of the State or local governing authority of the franchise territory." The trial court applied Missouri law. Franchisees argue that the laws of the states of Arkansas, Illinois, Iowa, Michigan, Virginia, and Washington should have been applied as to the franchises in those states because those states have a materially greater interest in this controversy and have statutory laws prohibiting termination of the franchise agreements. Franchisees do not disagree that Missouri law applies to the remaining franchises not located in those six states.

◼ A fundamental principle of conflicts is that a forum state will always apply forum procedure, but it will choose the applicable substantive law according to its own conflict of law doctrines. *Ernst v. Ford Motor Co.*, 813 S.W.2d 910, 921 (Mo. App. W.D.1991). Missouri follows the Restatement (Second) of Conflicts of Law (1971) in contract actions. *Id.* Section 187(1) of the Restatement gives effect to the parties' contractual choice of law "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." RESTATEMENT (SECOND) CONFLICT OF LAW § 187(1) (1971). Thus, whether Block and Franchisees could have determined the issue of termination of the contracts by explicit agreement must first be determined.

◼ "Whether the parties could have determined a particular issue by explicit agreement directed to that issue is a question to be determined by the local law of the state selected by application of the rule of § 188." RESTATEMENT (SECOND) CONFLICT OF LAW § 187 cmt. c (1971). If the local law of the state selected by application of section 188, therefore, regulates the termination or nonrenewal of the franchise agreements *and* provides that the provisions cannot be waived, the parties could not agree to the terms. *Ernst*, 813 S.W.2d at 921.

◼ Section 188 employs the "most significant relationship" test. *Dillard v. Shaughnessy, Fickel & Scott Architects, Inc.*, 943 S.W.2d 711, 715 (Mo.App. W.D. 1997). Section 188(2) identifies five potentially significant contacts to be considered in a contract case when determining which state has the most significant relationship to the transaction and parties:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract,

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT (SECOND) CONFLICT OF LAW § 188(2) (1971); *Dillard*, 943 S.W.2d at 715. In considering these five factors, the principles of section 6 of the Restatement must also be applied. RESTATEMENT (SECOND) CONFLICT OF LAW § 188(1) (1971); *Dillard*, 943 S.W.2d at 715. The choice of law principles under section 6 are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) CONFLICT OF LAW § 6(2) (1971).

■ Applying the factors of section 188 and the principles of section 6, Missouri has the most significant relationship to the transaction. The record shows that Missouri is the state of incorporation of H & R Block, Inc., the place of the headquarters of H & R Block and its wholly owned subsidiaries, and the place of part of the performance under the contract. Additionally, application of the law of Missouri, the law chosen by the parties to govern their franchise agreements, is consistent with the principle that the justified expectations of the parties be protected. Finally, the goals of predictability and uniformity will be met by applying Missouri law to the franchise agreements no matter where the individual franchises are located.

■ Because Missouri has the most significant relationship to the transaction and parties, Missouri law determines whether Block and Franchisees could have determined the issue of termination of the franchise agreements by explicit agreement. Missouri law does not preclude an agreement between the parties concerning termination of their franchise agreements. *Ernst,* 813 S.W.2d at 921. The parties' contractual choice of law is, therefore, given effect under section 187(1) of the Restatement.

Franchisees argue that under section 187(2) of the Restatement, the laws of Arkansas, Illinois, Iowa, Michigan, Virginia, and Washington apply over the law of Missouri. Subsection 2 applies, however, "when it is sought to have the chosen law determine issues which the parties could *not* have determined by explicit agreement directed to the particular issue." RESTATEMENT (SECOND) CONFLICT OF LAW § 187 cmt. d (1971)(emphasis added). *See also Estate of Brown,* 955 S.W.2d 940, 945 (Mo.App. S.D.1997). As discussed, the parties could resolve the issue of termination of the franchise agreements by explicit agreement. Only subsection 1 was applicable in the choice of law analysis. Missouri law applies to this case.

## V. Duration of Franchise Agreements

Franchisees claim that the trial court erred in granting summary judgment in favor of Block on its counterclaim finding that the franchise agreements are contracts for indefinite duration and, thus, terminable at will at the end of any five-year term. Franchisees contend that the franchise agreements are not for an indefinite duration because the agreements expressly state that they will continue unless terminated by mutual agreement or for cause.

To be entitled to summary judgment under Rule 74.04 as a claimant, the movant must establish that (1) it is entitled to judgment as a matter of law and (2) there is no genuine dispute as to the material facts upon which it would have the burden of persuasion at trial. *ITT,* 854 S.W.2d at 380–81. Once the movant has made this prima facie showing as required by Rule 74.04, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Id.* at 381. The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions

on file to demonstrate the existence of a genuine issue for trial. *Id.*

In this case, to make a prima facie case for summary judgment on its counterclaim for declaratory judgment, Block was required to plead all of the facts necessary to establish each and every element of its declaratory judgment claim, referencing the pleadings, discovery or affidavits. *Id.* at 380. Block filed a counterclaim seeking a declaration that the franchise agreements were contracts of indefinite duration; that their terms may be renewed only with the consent of both parties; and that if not so renewed, the term of each of the agreements will expire at the end of the current term. In its motion for summary judgment and suggestions in support thereof, Block alleged that it was entitled to judgment as a matter of law on its counterclaim because the language of the franchise agreements, specifically the automatic renewal provisions, precluded a finding that the agreements were enforceable perpetual contracts and instead created contracts that terminated at the end of any current term unless renewed with the consent of both parties. The material facts on which Block relied for summary judgment were not disputed; the only issue on appeal is whether Block was entitled to judgment as a matter of law on those facts.

The cardinal rule in contract interpretation is to ascertain the intention of the parties and to give effect to that intention. *Atlas Reserve Temporaries, Inc. v. Vanliner Ins. Co.*, 51 S.W.3d 83, 87 (Mo.App. W.D.2001)(quoting *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973)). Unless the contract is ambiguous, the intent of the parties is determined based on the contract alone, not on extrinsic or parol evidence. *Id.* In determining whether a contract is ambiguous, words should be given their natural and ordinary meaning.

*Id.* A contract is ambiguous if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain. *Id.* A contractual provision is not ambiguous merely because the parties disagree over its meaning. *Id.*

In granting partial summary judgment in favor of Block and finding that the franchise agreements are contracts of indefinite term, that they may be renewed only if both parties consent, and that if the contracts are not renewed, they expire at the end of the current term, the trial court relied on the recent Western District case, *Preferred Physicians Mutual Management Group, Inc. v. Preferred Physicians Mutual Risk Retention Group, Inc.,* 961 S.W.2d 100 (Mo.App. W.D.1998). The dispute in *Preferred Physicians* involved a contract entered into in July 1991 between two companies wherein one company agreed to provide comprehensive management and operational services to the other for monetary compensation. *Id.* at 102. The contract provided the following concerning duration and termination:

> The initial term of this Agreement shall be until January 1, 1995; provided, however, that this Agreement shall automatically be renewed for terms of five (5) years thereafter, unless terminated as permitted by [this contract by Risk Retention Group for cause] or both of the parties hereto give written notice of their intent not to renew this Agreement[.]

*Id.* In analyzing the duration provision, this court first found that the provision, although quite unusual in providing for automatic renewals unless both parties assented to termination, was not ambiguous. *Id.* at 103. The court then found that the practical effect of the provision was the creation of a perpetual contract. *Id.* The issue then decided by the court was whether the contract was an *enforceable* perpet-

ual contract. *Id.* In analyzing this issue, this court relied on the Missouri Supreme Court case, *Paisley v. Lucas,* 346 Mo. 827, 143 S.W.2d 262 (1940).

*Paisley* involved a contract between an insurance agent and an insurance company. *Id.* at 264. The contract provided that it would not be cancelled except by mutual agreement or unless the state insurance department demanded cancellation. *Id.* at 269. Upon demand of the state insurance department, the insurance company attempted to cancel the contractual relationship with the agent. *Id.* at 270. The agent sued for breach of contract claiming that the contract was a contract of employment for life. *Id.*

The Supreme Court noted that Missouri courts "are prone to hold against the theory that a contract confers a perpetuity of right or imposes a perpetuity of obligation." *Id.* (quoting *James Maccalum Printing Co. v. Graphite Compendius Co.,* 150 Mo.App. 383, 130 S.W. 836, 838 (1910)). Thus, it explained, a contract will not be construed to confer a right or impose an obligation in perpetuity unless the language of the contract compels such construction. *Id.* at 270–71 (quoting *James Maccalum Printing Co.,* 130 S.W. at 838). The intention to create a perpetual contract must be unequivocally expressed. *Id.* (quoting *James Maccalum Printing Co.,* 130 S.W. at 838). Because the contract in *Paisley* did not indicate an express intention that the contract should continue so long as the agent should live, the employment was to continue only so long as it was mutually satisfactory to the parties. *Id.* at 270. Thus, the Court held that the agent's employment under the contract was for an indefinite period and could be terminated at the will of either party. *Id.* at 271.

In *Preferred Physicians,* this court held that the duration provision of the contract did not compel a reader to conclude that the parties intended perpetual performance. 961 S.W.2d at 104. It explained:

Had the parties desired a perpetual contract, they could have easily included specific language expressing that desire rather than setting up a series of five-year contracts which had to be renewed unless both parties agreed not to renew.... That a contract would run for five years, terminate, and be in need of renewal—whether automatically or otherwise—belies any contention that it was to run in perpetuity. A contract that runs forever has no need for renewal.

*Id.*

After determining that the provision failed to create an enforceable perpetual contract, the contract's duration was considered. This court reversed the trial court's finding that because the contract was not perpetual, it was of indefinite duration and terminable at the will of either party. *Id.* at 105. Instead, the contract had definite, fixed terms, specifically termination dates of midnight on December 31, 1994, and thereafter on midnight of December 31, 1999, December 31, 2004, December 31, 2009, and so on, and that the parties' performance was obligated under the contract until at least midnight on December 31, 1994. *Id.* Relying on a Georgia Court of Appeals case, Judge Spinden, writing for the court, wrote that, when given a reasonable construction, the automatic renewal provision will not require the renewal of the contract for an additional five years except upon the *mutual assent* of the parties. *Id.* at 104, 105 (citing *Nikas v. Hindley,* 99 Ga.App. 194, 108 S.E.2d 98, 100, 102 (Ct.App.1959)). Thus, under the automatic renewal provision, either party could elect not to renew and to terminate the contract at the expiration of any five-year term. *Id.*

Franchisees contend that *Preferred Physicians* is inapplicable to this case because it and the case upon which it relied, *Paisley,* involved contracts for employment or personal service. Franchisees argue that the policies underlying franchises are quite different than the policies embodied in employment law. A similar contention was made in *Superior Concrete Accessories v. Kemper,* 284 S.W.2d 482 (Mo.1955). *Kemper* involved a distributor's sales agreement between Superior Concrete Accessories, Inc. (Superior) and Merle E. Kemper Company (Kemper). *Id.* at 485. Superior was engaged in the business of manufacturing, distributing, and selling steel products for use in concrete construction work. *Id.* Under the distributor's sales agreement, Kemper took orders in Superior's name for merchandise in Kemper's exclusive territory and sent those orders to Superior. *Id.* Superior then filled the orders and shipped the merchandise directly to the purchaser. *Id.* The distributor's sales agreement also required Kemper to maintain, at its sole expense, a warehouse for consigned stock. *Id.* Kemper maintained its own office, advertised in its own name, and employed salesmen at its sole expense to sell the product. *Id.* at 489.

The distributor's sales agreement provided that it would continue in effect until cancelled by mutual agreement. *Id.* Because the duration of the contract was not fixed expressly or by implication, the Supreme Court held that its duration was indefinite. *Id.* at 490. Applying *Paisley* and other cases, the Court held that because the contract was for an indefinite period of time, it could be terminated at the will of either party. *Id.*

Like Franchisees in this case, Kemper contended that *Paisley* was not applicable because the contract in that case was a contract for employment or personal service. *Id.* The Supreme Court was not persuaded by Kemper's contention explaining that while the contract in *Paisley* was primarily for personal services of the agent, it was not entirely so. Similarly, while Superior contracted with Kemper to obtain his skill and ability as a salesman, the agreement did not call for purely personal services. *Id.* at 491. The Court, thus, found that the general principles expressed in *Paisley* regarding perpetual contracts were applicable to the distributor's sales agreement. *Id.*

The franchise agreements in this case are similar in nature to the distributor's sales agreement in *Kemper.* In *Kemper,* the Supreme Court generally explained a distributor's sales agreement:

> The agent or buyer does more than merely offer to render service in the sale of the manufacturer's product or to pay the stipulated price therefor. If not expressly provided, it is at least expected and understood that the agent or buyer is to make an investment and to build and maintain a business establishment for the sale or distribution of the manufacturer's product. It may also be said that the manufacturer does more than sell to the distributor or make available his product to the agent. He entrusts the fate of his product in the defined territory exclusively to the agent or distributor and foregoes the opportunity to resort to other sources of distribution in that locality.

*Id.* at 489. In the franchise agreements at issue in this case, Franchisees contracted to do more than merely act as a representative of Block in rendering tax preparation services. They were required to establish and maintain offices to conduct their businesses. Such investment included leasing or purchasing real estate, purchasing supplies and equipment, and hiring employees. Additionally, Franchisees

advertised and promoted their individual offices at their own expense. On the other hand, Block entrusted its name exclusively to Franchisees in the defined territories and promised to refrain from rendering its services through other sources in those localities. Thus, just as *Paisley* applied in *Kemper, Paisley* and *Preferred Physicians* are applicable in the instant case.

 The duration provision in the franchise agreements in this case is very similar to the provision in *Preferred Physicians*. It provides:

> The term of this Agreement shall run for a period of five years from the date hereof, with further provisions that it shall be automatically renewed for successive periods of five years each, unless mutually terminated or terminated pursuant to paragraph 12.

This provision is not ambiguous. The plain and ordinary meaning of the terms indicates that a franchise agreement has an initial term that lasts five years from the date of the agreement and that the agreement will renew itself thereafter with no affirmative action by the parties for successive five-year terms. The unusual provision that provides for automatic five-year renewals unless both parties assent to termination does not make the provision ambiguous. *See Preferred Physicians,* 961 S.W.2d at 103. And because the contract is unambiguous, the trial court did not err in excluding extrinsic evidence as to the intent of the parties. *Atlas Reserve,* 51 S.W.3d at 87–88; *Preferred Physicians,* 961 S.W.2d at 103.

 The practical effect of the duration provision in the franchise agreements is the creation of a perpetual contract. *See Preferred Physicians,* 961 S.W.2d at 103. As written, a franchise agreement is to continue for an initial period of five years from the date of the agreement and then automatically renew for a series of five-year contracts until the parties agree not to renew the agreement and, therefore, to terminate the business relationship. The parties, however, failed to create an *enforceable* perpetual contract. The duration provision does not unequivocally express an intent of the parties to create a perpetual, never-ending franchise agreement. Instead, the clause providing for automatic renewal contradicts an intention that the contract would last forever. As stated in *Preferred Physicians,* "That a contract would run for five years, terminate, and be in need of renewal—whether automatically or otherwise—belies any contention that it was to run in perpetuity." *Id.* at 104. In the absence of a clear and compelling declaration of the parties' intent to create perpetual franchise agreements, the agreements will not be recognized as such. The language in the franchise agreements, specifically the automatic renewal provisions, precludes any contention that the parties intended compulsory, perpetual relationships. Thus, to the extent that the trial court found that the franchise agreements are not perpetual contracts, that part of the order is affirmed. But to the extent that the trial court found that the agreements are contracts of an indefinite term, the trial court erred.

 The franchise agreements are not indefinite contracts. Instead, they have definite, fixed terms. The parties explicitly provided for five-year terms. A franchise agreement has an initial period beginning on the date of its formation and expiring five years later. Thereafter, if renewed, the agreement will run for another term of five years. The franchise agreements' renewal provision will not, however, be enforced without assurance of mutual assent. As stated in *Preferred Physicians,* "The provision for automatic renewal when give a reasonable construction will not be held to require the renewal or extension of the contract for additional five-year periods except upon the mutual

assent of the parties thereto at or before the date of renewal." *Id.* at 104, 105 (quoting *Nikas,* 108 S.E.2d at 102). To enforce the automatic renewal provision would enable one party to coerce the other into a perpetual cycle of five-year obligations and would render the five-year provisions of the duration provision meaningless. In contract interpretation, every word in the contract is to be given meaning if possible. *Gulf Ins. Co. v. Noble Broadcast,* 936 S.W.2d 810, 814 (Mo. banc 1997). Thus, should the parties desire, they may choose to continue their relationship under a renewed contract for an additional five-year period. In such a case, the parties would be bound to the completion of that five-year term except for instances of material breach or a mutual agreement to terminate sooner. The trial court did not err in finding that the franchise agreements may be renewed only if both parties consent and that, if the agreements are not renewed, they expire at the end of the current five-year term.

This court recognizes the uniqueness of franchise agreements in the business world. Because of the large investment of capital, time, and effort, the duration of a franchise agreement is very important to a potential franchisee. HAROLD BROWN, FRANCHISING: REALITIES AND REMEDIES 79 (2nd ed.1978). If the franchisor is totally free to terminate and deny renewal of the franchise after a relatively short duration, the franchisee is significantly disadvantaged because the equity built up in the franchisee's business is jeopardized. *Id.* at 44. Missouri policy, however, protects franchisees at termination of franchise relationships. Both Missouri statutory and common law reflect this policy. Section 407.405 provides that no franchise may be terminated without giving the franchisee ninety days advance written notice of the termination. § 407.405, RSMo 2000. In *Electrical & Magneto Service Co. v. AM-BAC International Corp.,* 941 F.2d 660

(8th Cir.1991), the Eighth Circuit Court of Appeals found that Missouri's ninety-day notice requirement for cancellation of a franchise agreement is such a fundamental policy of state law that Missouri courts would not apply a choice of law provision selecting a state that did not have a similar requirement. *Id.* at 662. In analyzing section 407.405, the Eighth Circuit explained:

> [T]he Missouri Legislature created a legislative presumption that franchisees are in an inferior bargaining position with respect to franchisors and thus are entitled to protection from the oppressive use of the franchisor's superiority. The Legislature has further decreed that allowing franchisors to terminate franchise agreements with less than ninety-days notice is oppressive use of bargaining strength. Franchisees are entitled to rely on these presumptions and take advantage of the statute's protection regardless of their true economic power....

*Id.* at 663 n. 3.

Additionally, Missouri courts apply the recoupment doctrine to protect franchisees. The doctrine is a limitation on the general rule that where a franchise, exclusive agency, or distributorship agreement says nothing about duration and does not specifically deal with termination, the contract is terminable at the will of either party. *Ernst,* 813 S.W.2d at 918–19. The doctrine imputes to a terminable-at-will agreement a duration equal to the length of time reasonably necessary for a dealer to recoup its investment, plus a reasonable notice period before termination. *Id.* at 918. The recoupment doctrine provides:

> [U]pon termination, the agent becomes entitled to recoupment or to compensation on a quantum meruit basis where the agent, induced by his appointment, has in good faith incurred expense and devoted time and labor in the matter of

the agency without having had a sufficient opportunity to recoup such expenditures from the undertaking.

*Id.* at 919. *See also Kemper,* 284 S.W.2d at 491–92. Any further protection of franchisees at termination of franchise relationships is for the Missouri General Assembly to provide.

For the reasons stated above, the franchise agreements are not perpetual contracts but contracts of definite, fixed terms that may be renewed by the mutual assent of the parties. If not renewed, the agreements expire at the end of any five-year term. Thus, Block was entitled to judgment as a matter of law. The trial court, therefore, properly entered summary judgment in favor of Block on its counterclaim.

The judgment is reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion.

SPINDEN, P.J., and SMITH, J. concur.