## In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 02-1541, 02-2156

MOR-COR PACKAGING PRODUCTS, INC.,

*Plaintiff-Counterdefendant-*
*Appellee/Cross-Appellant,*

v.

INNOVATIVE PACKAGING CORP.,

*Defendant-Counterplaintiff-*
*Appellant/Cross-Appellee,*

v.

MARTIN FIELD,

*Counterdefendant-Appellee/*
*Cross-Appellant.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3855—**Wayne R. Andersen**, *Judge.*

---

ARGUED FEBRUARY 25, 2003—DECIDED MAY 1, 2003

---

Before POSNER, COFFEY, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendant in this diversity suit for breach of contract, IPC, appeals from a judgment in favor of the plaintiff, Mor-Cor, for some $300,000, rendered

after a bench trial. IPC had counterclaimed, charging that not it but Mor-Cor had broken the contract but naming Martin Field as an additional counterdefendant on the theory that Mor-Cor is Field's alter ego—which it is. The counterclaim was essentially the mirror image of the complaint, and so in ruling for the plaintiff the judge dismissed the counterclaim.

Mor-Cor cross-appeals from the judge's declining to award sanctions for IPC's refusal, which Mor-Cor contends was unjustified, to admit a fact. We take that up later and begin with IPC's appeal. Wisconsin law governs, but we have had difficulty finding pertinent Wisconsin cases.

IPC manufactures corrugated sheets used to make boxes. It appointed Mor-Cor (that is, Martin Field, and from here on we shall treat him rather than his company as the contracting party) to be IPC's exclusive agent for the sale of its corrugated sheets to a number of small box companies in the greater Chicago area listed in an attachment to the contract. The contract imposed the usual obligations on sales agent Field, such as that he use his best efforts to sell IPC's product, an obligation anyway implicit in an exclusive dealing contract. E.g., *Wood v. Duff-Gordon*, 118 N.E. 214 (N.Y. 1917) (Cardozo, J.); *Market Street Associates Limited Partnership v. Frey*, 941 F.3d 588, 596 (7th Cir. 1991). The contract authorized termination "by a party if the other party fails to perform any of its obligation[s] herein and such failure is not remedied by the other party within thirty (30) days of the other party's receipt of a written notice describing such failure." There are other grounds for termination in the contract that do not require giving the defaulting party an opportunity for cure, such as Field's committing fraud or becoming incapacitated, but none of them is applicable to this case.

Although the contract was for three years, it was by its terms renewable indefinitely, and IPC argues that this made

it terminable at will. What is true is that if a contract does not specify a term *or* any grounds for termination, a court may interpret it to be terminable at will rather than as subjecting each party to perpetual durance at the option of the other. *Irola & CIA, S.A. v. Kimberly-Clark Corp.*, No. 01-16203, 2003 WL 1643612, at *3-5 (11th Cir. Mar. 31, 2003); *Nicholas Laboratories Ltd. v. Almay, Inc.*, 900 F.2d 19, 21-22 (2d Cir. 1990) (per curiam); cf. *Ferraro v. Koelsch*, 368 N.W.2d 666, 671-74 (Wis. 1985). Grounds for termination were specified in this contract; and even if they had not been, when the duration of a contract is indefinite only by virtue of a right of unlimited renewal a party cannot terminate the contract without cause before the expiration of the initial term. *Armstrong Business Services, Inc. v. H & R Block*, 96 S.W.3d 867, 877 (Mo. App. 2002); *Preferred Physicians Mutual Management Group, Inc. v. Preferred Physicians Mutual Risk Retention Group, Inc.*, 961 S.W.2d 100 (Mo. App. 1998); *A.G. Nikas v. W.F. Hindley Beverage Distributors, Inc.*, 108 S.E.2d 98, 101-02 (Ga. App. 1959).

The contract went into effect in 1997. Two years later Field became interested in acquiring a local box maker named Jet Age Container. Jet Age was not a customer of IPC but it was a competitor of most of IPC's Chicago-area customers. By the end of June 1999, Field had an agreement in principle to acquire Jet Age, and while he intended the acquisition to provide an income for his two sons and intended to retain only a 1 percent interest in the business, he had the acquiring corporation that he created make him manager for life with complete authority over all aspects of the business. The following month he offered the position of plant manager of Jet Age to an employee of one of IPC's Chicago-area customers for which Field was IPC's exclusive sales agent.

Field had not told IPC about his designs on Jet Age, but the irate owner of the box company to whose employee

Field had offered the job of plant manager phoned the president of IPC to complain. The owner was angry not only about losing his employee but also about having to compete with his supplier. Jet Age was a competitor of his; Field as IPC's exclusive sales agent was his supplier; and Jet Age and Field were, for all practical purposes, one and the same—or rather would be when and if Field's purchase of Jet Age was consummated.

It was consummated in September but by then Field was no longer IPC's agent. IPC had terminated him the previous month, immediately upon learning from the box company of Field's plans to buy Jet Age, without giving him an opportunity to cure; and this suit followed.

The contract as we said required Field to use his best efforts to sell IPC's corrugated sheets, and the central question in the case is whether he could fulfill this obligation at the same time that he was managing a company that competed with his customers. The parties treat this as a question of fact, *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 645 (6th Cir. 1991); *Davidson & Jones Development Co. v. Elmore Development Co.*, 921 F.2d 1343, 1350-51 (6th Cir. 1991); cf. *In re Abbott Laboratories Derivative Shareholders*, No. 01-1952, 2003 WL 1572015, at *12 (7th Cir. Mar. 28, 2003), involving as it does the application of a standard, "best efforts," to the particular circumstances of the case, *American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897, 905-06 (2d Cir. 1998); *Polyglycoat Corp. v. C.P.C. Distributors, Inc.*, 534 F. Supp. 200, 203 (S.D.N.Y. 1982), rather than as a question that might be answerable by referring to a rule on conflicts of interest. Ordinarily the trial judge's answer to a question of fact would come to us fortified by the clearly-erroneous rule. But the district judge's method of deciding the case disentitles his ruling to the usual deference.

At the conclusion of the bench trial, he convened the lawyers and told them that "we are here to announce or discuss or hear, maybe, some additional argument with respect to the decision of the Court." What followed was a colloquy occupying almost 75 pages of transcript in which the lawyers and the judge exchanged their impressions of the various issues. On whether Field's proposed acquisition of Jet Age had violated the best-efforts clause, the judge said two things: (1) "I am not convinced that the parties would have had a productive relationship beyond the three-year term [of the contract]. It had already begun to deteriorate and the plaintiff had already begun to hedge his bets by initiating discussions to acquire a company which was going to take substantial amount of effort on his part, even if it wouldn't have eaten up all his efforts. We will never know if it would have undermined his salesmanship so much that he wouldn't have sold anything. But I think that your [Field's]—your son and son-in-law probably would have required enough oversight at the beginning so that your sales [for IPC] wouldn't have been at the level that IPC demanded it. But, once again, this is a we will never know." (2) "[B]y terminating the agreement immediately, IPC, I think, undermined the 30-day [cure] period in a way that could well have been meaningful. [Field] might not have gone through with the deal with Jet Age or they might have tailored Jet Age's business or purchases by Jet Age in such a way that IPC would have found it satisfactory. We will never know. So I think it was improper for IPC to terminate the agreement instantly based on the belief, reasonable though it was, that Mr. Field was going to acquire and operate a competitor of—of some of IPC's customers."

The judge asked the parties to agree on a set of findings of fact and conclusions of law that would reflect the colloquy from which we have been quoting. They did so. But

so far as the proposed acquisition of Jet Age was concerned, the findings of fact stated only that IPC had failed to give Field an opportunity to cure, while the conclusions of law stated that the court "does not conclude based upon the evidence presented that Mr. Field's proposed acquisition of Jet-Age [*sic*] constituted a breach." The judge adopted the findings and conclusions.

All that is clear from this confusing mélange is that the judge thought that IPC had violated the cure provision. Whether or not he was correct about that, a more important question, the answer to which we cannot dig out of the district judge's oral statements or terse written decision, is whether Field's proposed acquisition of Jet Age was a breach of his contract with IPC, because if it was, then Field has failed to prove substantial damages and almost certainly was overcompensated. (IPC's appeal does not challenge the computation of damages as such, but this is provided that we affirm the district judge's ruling on liability.) There is no evidence either that Field would have abandoned the acquisition in order to cure such a breach, or, as the district judge conjectured, that there were any conditions on the acquisition that Field would have accepted that would have enabled him to acquire and manage Jet Age yet continue to comply with the best-efforts clause in his contract with IPC. So far as appears, then, had IPC given Field 30 days to cure, the consequence would have been that when the 30 days were up the contract with IPC would have lawfully terminated; and in that event Field's only damages would have been whatever loss he sustained during the 30 days after he was terminated. There were 17 months left of the initial three-year term of the contract, and the bulk of the damages award to Field—some $277,000—represented an estimate of his lost profits for that period. (He did not seek damages based on the hypothesis that he would have exercised his

right to renew the contract at the end of that period.) If he was deprived of just one month's profits by IPC's breach, the award for lost profits would plummet to $16,000.

The conclusion in the judge's written decision that the proposed acquisition of Jet Age had not been proved to be a breach of contract on Field's part is at war with the language that we quoted earlier from part (1) of the judge's oral remarks. And it is not as if the conclusion were well supported by the evidence. While it is true that large suppliers of corrugated sheets, such as Stone Container, are also integrated forward into the manufacture of boxes from the sheets, so that they both supply and compete with other box companies, it does not follow that the pygmy local box companies on Field's customer list would be comfortable buying from a local competitor. Stone is unlikely to jeopardize a substantial business of selling corrugated sheets by using its integrated position to squeeze its competitor-customers, but Mr. Field for all one knows would use information that he obtains from his customers to compete more effectively against them with his newly acquired box company. If this is what the customers believe, he will be unable to use his best efforts to sell IPC's product; try as he might, his customers will tend to shun him. So at least IPC might reasonably believe and, so believing, legitimately declare him in violation of his best-efforts obligation. Remember that the contract is an exclusive one, so that IPC cannot bypass Field and appoint another agent to take up the slack while Field builds his box company at IPC's expense. Its exclusive feature is amplified by Field's right of indefinite renewal.

A further complication not helpful to Field is that the contract provides that customers will be dropped from his list who fail to buy at least 10 percent of their corrugated-sheet requirements from IPC. Field cannot determine the percentage they buy unless they are forthcoming with him.

They may well clam up once they realize that a competitor is inquiring about their purchasing decisions regarding a key input into their product. The mode of compensating Field suggests that IPC and he did not contemplate that he would be going into competition with his customers.

Field points us to cases that hold, sensibly enough, that merely planning to engage in a transaction that if consummated would create a conflict of interest justifying termination is not itself a breach of contract. E.g., *Southwest Forest Industries, Inc. v. Sharfstein*, 482 F.2d 915, 927-28 (7th Cir. 1972); *Midwest Janitorial Supply Corp. v. Greenwood*, 629 N.W.2d 371, 375 (Iowa 2001); *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 493 (Colo. 1989); see also *Restatement (Second) of Agency* § 393 comment e (1958). A person contemplating the lawful termination of an existing contractual relationship should be permitted to make future plans in order to smooth his transition from the existing relationship to a new one. But as the cases just cited (and the *Restatement*) make clear, Field forfeited this safe harbor by soliciting the plant manager of one of his principal's customers, thereby harming the principal, which *confidential* planning would not have done.

We are not, however, in a position to resolve definitively the question whether the proposed acquisition of Jet Age was incompatible with Field's duty of using his best efforts to sell IPC's product. The evidence is in dispute, and the district judge's opinion, as we have noted, is both internally inconsistent and inconsistent with his oral findings. Further proceedings will be necessary in the district court.

We turn last to the cross-appeal. In July 1999, the month before firing Field, IPC sent him a letter notifying him that he was in breach of various provisions of the contract and announcing that he would be terminated for those

breaches. There was no mention of the proposed acquisition of Jet Age; although it was in the works, IPC had not yet learned about it. In pretrial discovery, Field asked IPC to admit that it didn't consider the breaches listed in the July letter to be *material* breaches, that is, actual grounds for IPC's terminating him. IPC refused to admit this. Yet at trial its president testified that actually he would not have terminated Field had it not been for the later-discovered proposed acquisition of Jet Age; the July letter, he said, was intended merely as a "wake up" call to Field. Field argues that the president's testimony shows that the refusal to admit that the breaches listed in the July letter had not been material was sanctionable. Fed. R. Civ. P. 37(c)(2). It does not show that. There is a difference between believing that your contract partner has committed a material breach and wanting to terminate your contract with him because of it. Many, we suspect most, material breaches are forgiven, either in the hope that they will be cured or because self-help (as through termination) or legal remedies would cost the victim of the breach more than they were worth.

Circuit Rule 36 shall apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*