**NEWCO ATLAS, INC., Respondent,**

v.

**PARK RANGE CONSTRUCTION, INC., Appellant.**

**No. WD 69247.**

Missouri Court of Appeals,
Western District.

Dec. 16, 2008.

Frank F. Sallee, Kansas City, MO, for Respondent.

Christopher F. Pickering, Shawnee, KS, for Appellant.

Before VICTOR C. HOWARD, P.J., JOSEPH M. ELLIS, Judge and ALOK AHUJA, Judge.

VICTOR C. HOWARD, Presiding Judge.

Park Range Construction, Inc. ("Park Range") appeals the judgment of the trial court in favor of Newco Atlas (2004), Inc. ("Atlas"),[1] on Atlas's declaratory judgment action and the trial court's grant of Atlas's motion for summary judgment. Park Range presents five points on appeal, raising similar arguments against the trial court's declaratory judgment and its finding that summary judgment in favor of Atlas was proper. In challenging the declaratory judgment, Park Range claims that the trial court erred in finding that Atlas had not breached its contracts with Park Range and that Park Range had no breach of the implied covenant of good faith and fair dealing defense, and in failing to submit Park Range's defense to a jury. Similarly, Park Range argues that the trial court erred in granting Atlas's motion for summary judgment on Park Range's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing, and claims that it was entitled to a jury determination on these claims. The judgment is affirmed.

## Factual and Procedural Background

This case arises out of Atlas's termination of two contracts it entered into with

---

1. The original petition for declaratory judgment in this case was filed by Atlas Systems, Inc. The assets of Atlas Systems were later purchased by Newco Atlas, and the parties filed a stipulation for substitution of Newco Atlas as the plaintiff. To avoid confusion, the respondent will simply be referred to as "Atlas."

Park Range.[2] Atlas is a corporation that was originally formed by Don May for the purpose of marketing a steel piering system he had developed. May's piering system was used as a means for stabilizing and repairing foundations. In developing a market for his system, May selected contractors, such as Park Range, who performed this type of work and asked them to become dealers for Atlas. May personally negotiated on behalf of Atlas with Park Range and the two corporations entered into one contract in 1988 and another in 1991.

The first paragraph of each contract states that Atlas "hereby sells and assigns to [Park Range] the equipment and tools described on Schedule A." Schedule A is attached to the contracts and provides a list of the equipment and tools referred to in paragraph one. Paragraph three is entitled "Restraint On Other Sales of Equipment and Tools by Atlas Systems." This paragraph provides that Atlas "agrees not to sell to any other person other than [Park Range], any like equipment or tools within the geographical area" designated in the contract.[3] Paragraph four, entitled "Availability of Products," notes that Atlas "currently has manufactured products, fabricated and processed materials available for sale to [Park Range] at the prices shown on Schedule B." [4] Finally, the contracts state that Atlas's products and tools bear the service mark "Atlas Piers," and paragraph seven provides that Atlas "grants to the original Purchaser only the right and license to use the service mark 'Atlas Piers' in the geographical area de-scribed in Paragraph 3." The contract covering the Colorado Springs area states that the agreement can be terminated at any time by either party upon 60 days' prior written notice. The Denver contract is silent as to both the duration and termination of the contract.

The parties continued their relationship under the contracts without significant problems until approximately 1998. In 1998, Atlas sold piering products to a purchaser located outside the Denver area, but the products were to eventually be delivered within the Denver market. Although the parties disagreed upon whether this action was proper under the contract, no action was taken at that time.

In 1999, Jim Hensiek, the director of marketing for Atlas, began encouraging Park Range to increase its marketing efforts and infrastructure in order to better promote the Atlas piering system. Park Range followed this suggestion, and hired Dianne Rundell, an employee whose primary job would be to market the piering system. While sales did increase in response to Park Range's increased marketing efforts, Atlas believed that the exclusivity of the contracts limited Atlas's ability to sell and market its piering system. Therefore, in 2001, Atlas began attempting to negotiate non-exclusive contracts with Park Range to allow Atlas to take advantage of national accounts. Park Range rejected Atlas's offer to enter into non-exclusive contracts.

On September 10, 2002, Atlas gave Park Range formal written notice indicating that Atlas was terminating both of the

---

2. Along with Atlas Systems, Inc., the other party to the original contracts was Specialty Caissons, Inc. Park Range is the successor to Specialty Caisson's interest in the contracts.

3. One of the contracts limited the geographical territory to the Denver area, and the other was limited to Colorado Springs.

4. Despite this reference to "Schedule B," neither party has been able to locate a copy of either contract that contains this document.

contracts, and it would cease to ship items to Park Range on November 9. Because the Colorado Spring contract called for 60 days' notice before termination of the contract, Atlas believed that 60 days' notice would be sufficient for the Denver contract as well, although the Denver contract placed no such restriction on termination.

After terminating the contract, Atlas filed a petition for declaratory judgment asking the trial court to declare that Atlas's termination of the contracts was lawful. In its answer, Park Range asserted an affirmative defense, claiming that Atlas had breached the implied covenant of good faith and fair dealing by terminating the contracts for an improper purpose and in a way that would eliminate Park Range's expected economic benefits. Park Range also asserted several counterclaims, arguing that Atlas had breached both contracts by supplying products for distribution in the Denver and Colorado Springs markets to other dealers, and breached the implied covenant of good faith and fair dealing. Park Range also demanded a jury trial.

On August 28, 2006, the trial court began hearing evidence on Atlas's petition for declaratory judgment, but Park Range's counterclaims were not tried. The court subsequently issued its declaratory judgment, ruling that Atlas's termination of the Denver contract was lawful and was effective November 9, 2002. The court based the judgment on its findings that the Denver contract was terminable at-will by either party and that Park Range failed to prove facts supporting its defense of breach of the implied covenant of good faith and fair dealing.

Atlas later filed a renewed motion for summary judgment on Park Range's counterclaims, and on December 12, 2007, the trial court granted Atlas's motion. The court first found that while the contracts prohibited Atlas from selling equipment

and tools to other dealers in the Denver and Colorado Springs markets, the contracts contained no restriction on Atlas's ability to sell piering products and materials. Because the court found that these provisions were clear and unambiguous, there was no basis upon which to admit parol evidence, and the court ruled that Park Range's breach of contract claim failed as a matter of law. Additionally, the court found that the termination of an at-will distributorship agreement did not support a claim for damages for breach of contract and that summary judgment in favor of Atlas was proper. ·

This appeal by Park Range followed.

## I. Park Range's Points Appealed from Declaratory Judgment

In its first two points on appeal, Park Range contends that the trial court erred in entering judgment in favor of Atlas on its petition for declaratory judgment. Park Range claims in its first point that the trial court failed to give meaning and effect to all of the contract terms and the intent of the parties when it found that the contract did not prohibit Atlas from selling products to other dealers in the exclusive geographical areas designated in the contracts. In its second point, Park Range claims that it produced evidence supporting its breach of the implied covenant of good faith and fair dealing defense and that the trial court should have submitted the defense to a jury or found that Park Range had a valid defense to Atlas's declaratory judgment action.

### A. Standard of Review

■ "The standard of review for a declaratory judgment action is the same as in any other court-tried case, the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)." *Burris v. Mercer County*, 252 S.W.3d 199, 201 (Mo.App.

W.D.2008). Therefore, the appellate court will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy*, 536 S.W.2d at 32. "Interpretation of a contract is a question of law and is subject to *de novo* review." *Crestwood Shops, L.L.C. v. Hilkene*, 197 S.W.3d 641, 648 (Mo.App. W.D. 2006). The determination of whether a contract is ambiguous is also a question of law subject to *de novo* review. *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 367 (Mo.App. W.D.2008).

## B. Analysis

Park Range claims in its first point that the trial court misinterpreted the language of the contracts when it found that they did not limit Atlas's ability to sell products to other dealers within the Denver and Colorado Springs markets. "The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention." *Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 479 (Mo.App. W.D.2002). Where the language of the contract is unambiguous, the intent of the parties will be ascertained from the language of the contract alone and not from extrinsic or parol evidence of intent. *Id.* " 'A contract is ambiguous only if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain.' " *Id.* (quoting *Atlas Reserve Temps. v. Vanliner Ins. Co.*, 51 S.W.3d 83, 87 (Mo.App. W.D.2001)). A contract is not rendered ambiguous simply because the parties disagree as to its construction. *Id.* Furthermore, in interpreting a contract, a court may not create an ambiguity through the use of extrinsic or parol evidence. *City of St. Joseph*, 251 S.W.3d at 368 (quoting *Lupo v. Shelter Mut. Ins. Co.*, 70 S.W.3d 16, 20 (Mo.App. E.D.2002)).

■ Park Range first notes that the trial court found that piers were products and not equipment or tools. Park Range argues that this interpretation was incorrect because the plain language of the contract shows that piers fall within the plain and ordinary meaning of equipment and tools. In an attempt to bolster its claim, Park Range included the Webster's Dictionary definitions for "equipment" and "tool." Resorting to dictionary definitions is unnecessary, however, because the language of the contract clearly and unambiguously demonstrates that the parties intended for "equipment and tools" and "products and materials" to be treated separately.

Although Park Range argues that "equipment and tools" are not defined by the contract, the reference to "Schedule A" in paragraph one serves as a limitation on the items that may constitute "equipment and tools." Paragraph one provides for the sale and assignment to Park Range of "the equipment and tools described on Schedule A." The list on Schedule A contains items that are presumably used to install Atlas piers but does not include the piers themselves.

In addition, other provisions of the contract treat "equipment and tools" and "products" separately. For instance, the third paragraph specifically addresses a restraint on the sale of "equipment and tools." This section provides that Atlas agrees not to sell "any like equipment or tools" to another dealer within the geographical area. As previously stated, "equipment and tools" refers to those items listed on Schedule A, and piers are not included on that list. "Products" are dealt with in a separate section, paragraph four, which notes that Atlas has products and materials available that Park Range may purchase at the prices shown on

Schedule B. Unlike the section addressing "equipment and tools," paragraph four does not contain a restriction on Atlas's ability to sell products or materials to another dealer within the geographical areas designated in the contracts. These provisions clearly and unambiguously indicate that the parties intended to treat "equipment and tools" and "products" separately. We agree with the trial court's interpretation that piers are not "equipment" or "tools," and that, therefore, the contract did not place a restriction on Atlas's ability to sell piers.

■ Park Range next makes the assertion that paragraph seven of the contracts gave Park Range the exclusive right to use the service mark "Atlas Piers" in the geographical areas designated in the contracts. Because the piers utilized the service mark, Park Range argues that it had the exclusive right to use the piers, even if they are "products" rather than "tools" or "equipment." In paragraph seven, Atlas grants to Park Range "only the right and license to use the service mark 'Atlas Piers' in the geographical area." Park Range interprets this language to mean that only Park Range may use the service mark. However, in grammatical terms, the word "only" modifies the language it immediately precedes. Under this reading, paragraph seven would be granting to Park Range "only the right and license," as opposed to an assignment, to use the service mark. This is precisely the interpretation that Atlas advances in its brief.

Furthermore, Park Range's interpretation of paragraph seven creates a conflict with the other provisions of the contract. While the clear and unambiguous language of the contract shows that there is no restriction on Atlas's ability to sell "products," Park Range's reading of paragraph seven would impose such a restriction. Because the other provisions of the con-

tract clearly treat "products" separately from "equipment and tools" and do not place a restriction on Atlas's ability to sell products, Park Range's interpretation of paragraph seven reads into the contract an obscure limitation on the sale of products when the restriction on equipment and tools is clearly stated in the contract. Therefore, we adopt Atlas's interpretation of paragraph seven, and find that it grants to Park Range the right and license, instead of an assignment, to use the service mark and reject the interpretation that the provision gave Park Range an exclusive right to use the service mark.

■ Finally, Park Range argues that the testimony of Don May establishes that the contracts were designed to create exclusive dealerships with respect to equipment, tools, and products. This argument attempts to use extrinsic evidence to establish the intent of the parties. Because we find that the contract was clear and unambiguous in declining to place a restriction on the sale of products, extrinsic evidence of intent is inadmissible, and Park Range's argument regarding Don May's testimony is irrelevant. Point one is denied.

■ In its second point, Park Range asserts that the trial court erred in finding that Park Range did not have a valid defense of breach of the implied covenant of good faith and fair dealing. Park Range claims that it does have such a defense in the context of an at-will distributorship agreement and that it produced evidence to support the defense. Park Range argues that, therefore, the trial court should have found that Park Range had a valid defense to Atlas's declaratory judgment action or should have submitted the defense to a jury.

■ In its brief, Park Range observes that it is unclear whether the basis for the

trial court's decision was that Park Range did not present any evidence to support its defense or that the trial court's interpretation of the contract did not provide for such a defense. This court "is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Bus. Men's Assurance Co. of Am. v. Graham,* 984 S.W.2d 501, 506 (Mo. banc 1999). Therefore, we will affirm the judgment if the trial court reached the correct result, "regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Id.* Because we find that the termination of an at-will distributorship agreement does not support a claim for breach of the implied covenant of good faith and fair dealing, the trial court reached the correct result, regardless of its reasoning.

 A covenant of good faith and fair dealing is implied by Missouri law in every contract. *City of St. Joseph,* 251 S.W.3d at 369. This covenant imposes a duty on each party "to cooperate with the other to enable performance and achievement of the expected benefits" of a contract. *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 368 (Mo.App. W.D.1996). However, it is important to note that when parties begin to perform under a distributorship agreement that does not address the duration or termination of the agreement, courts will construe the contract as terminable at the will of either party. *Ernst v. Ford Motor Co.,* 813 S.W.2d 910, 918–19 (Mo.App. W.D.1991). By failing to include provisions addressing the duration

or termination of the agreement, Atlas and Park Range entered into an at-will distributorship agreement.

 Missouri courts have held that, in the context of an at-will distributorship agreement, the doctrine of recoupment applies. *See, e.g., id.* at 918. "The recoupment doctrine imputes into a contract a duration equal to the length of time reasonably necessary for a dealer to recoup its investment, plus a reasonable notice period before termination." *Id.* The trial court already concluded that Park Range had recouped its investment and was, therefore, not entitled to compensation under the recoupment doctrine. Park Range does not appeal this finding. Thus, the only remaining question is whether Park Range can utilize the defense of breach of the implied covenant of good faith and fair dealing rather than the recoupment doctrine in the context of an at-will distributorship agreement.

When read in conjunction, Missouri cases dealing with the doctrine of recoupment and cases involving employment at-will agreements indicate that Missouri does not imply a covenant of good faith and fair dealing in at-will distributorship agreements. *See, e.g., Armstrong Bus. Servs., Inc. v. H & R Block,* 96 S.W.3d 867 (Mo.App. W.D.2002); *Bishop v. Shelter Mut. Ins. Co.,* 129 S.W.3d 500 (Mo.App. S.D.2004); *Kelly v. State Farm Mut. Auto. Ins. Co.,* 218 S.W.3d 517 (Mo.App. W.D. 2007).[5] In cases such as *Armstrong,* Missouri courts have applied the recoupment doctrine as the remedy in situations involv-

---

**5.** In its brief, Park Range relies on *Armstrong, Bishop,* and a case mentioned in *Bishop, Machine Maintenance & Equipment Co. v. Cooper Industries, Inc.,* 634 F.Supp. 367, 372 (E.D.Mo.1986), for the proposition that an at-will distributorship agreement includes an implied covenant of good faith and fair dealing. In *Machine Maintenance,* the court concluded that where a distributorship agree-

ment gave the defendant a right to terminate the agreement without cause, if the defendant acted in bad faith in exercising this right, "a cause of action for breach of the duty of fair dealing would arise." 634 F.Supp. at 372. As the court in *Bishop* noted, the observation made by the court in *Machine Maintenance* was based on a Ninth Circuit case construing South Carolina law. *See deTreville v. Out-*

ing certain types of at-will agreements, rather than providing a remedy under a breach of contract or implied covenant of good faith and fair dealing theory. *See, e.g.,* 96 S.W.3d at 878. This court has described the recoupment doctrine as "a limitation on the general rule that where a franchise, exclusive agency, or distributorship agreement" does not refer to its duration or termination, the contract is characterized as terminable at-will. *Id.*

Similarly, in analyzing claims arising from the termination of at-will employment agreements, Missouri courts have held that the employment at-will doctrine does not allow a claim for breach of an implied covenant of good faith and fair dealing. *See Kelly,* 218 S.W.3d at 524; *Bishop,* 129 S.W.3d at 506. Although the court in *Kelly* was evaluating claims under the law of several different states, including Missouri, it provided sound reasoning for its decision. The court noted that implying a covenant of good faith and fair dealing in an at-will employment contract would run counter to the very nature of such a contract. *See* 218 S.W.3d at 524 (citing *City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex.2000)). Since an at-will contract allows an employer to terminate an employee for no cause, or even bad cause, to impose a covenant of good faith and fair dealing would contradictorily alter an intrinsic function of the contract. *See id.* (citing *Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 596 A.2d 1069, 1077 (1991)). Rather than an implied covenant of good faith and fair dealing, at-will employees

may use the theory of wrongful termination. *See Bishop,* 129 S.W.3d at 506. This is analogous to the availability of the recoupment doctrine for a claim arising out of the termination of an at-will distributorship. In addition, the issue at hand has been directly addressed in at least one state, and the court in that case found that although a duty of good faith and fair dealing is implied in every contract as a matter of law, the court would not imply the duty in an at-will sales distribution agreement, as it "would be inconsistent with and destructive of the unfettered right to terminate at will." *Jespersen v. Minn. Min. & Mfg. Co.,* 288 Ill.App.3d 889, 224 Ill.Dec. 85, 681 N.E.2d 67, 71 (1997).

Because Missouri courts have designated the recoupment doctrine as the remedy to be utilized by parties to an at-will distributorship agreement and found that the imposition of a covenant of good faith and fair dealing runs counter to the nature of an at-will contract, we decline to impose this covenant in the parties' contract. In light of our finding that, as a matter of law, Park Range does not have a valid defense of breach of the implied covenant of good faith and fair dealing, there were no issues of fact for the jury to decide, and the trial court did not err in failing to submit Park Range's defense to a jury. Point two is denied.

## II. Park Range's Points Appealed from Summary Judgment

In its final three points on appeal, Park Range contends that the trial court erred

---

board *Marine Corp.,* 439 F.2d 1099, 1100 (4th Cir.1971).

Park Range also points to a section in *Bishop* where the court relies on *Armstrong* to explain that "Missouri policy, both at common law and by statute, is to protect franchisees and those operating under distributorship agreements from the onerous effects of bad faith at-will termination." *Bishop,* 129 S.W.3d at 505 (citing *Armstrong,* 96 S.W.3d at

877–79). A reading of *Armstrong* reveals that the only protections discussed in that case are the statutory protections afforded to franchisees, and the application of the recoupment doctrine. 96 S.W.3d at 878. Nowhere in *Armstrong* does the court mention the implication of a covenant of good faith and fair dealing as a means of protecting parties to franchise, exclusive agency, or distributorship agreements.

in entering summary judgment in favor of Atlas on Park Range's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. In its third point, Park Range again argues that the trial court misinterpreted the contract when it found that the contract did not restrict Atlas's ability to sell products. Park Range mentions in its third point, and asserts more fully in its fourth point, that there were disputed facts in that the testimony regarding the intent of the parties created issues of fact for determination by a jury. Lastly, Park Range claims in its fifth point that the termination of an at-will distributorship agreement does support a claim for breach of the implied covenant of good faith and fair dealing.

## A. Standard of Review

An appellate court's review of an appeal from summary judgment "is essentially *de novo*." *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Co.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Whether or not summary judgment should be granted is an issue of law, and "an appellate court need not defer to the trial court's order granting summary judgment." *Id.* "Summary judgment will be upheld on appeal if: (1) there is no genuine dispute of material fact, and (2) the movant is entitled to judgment as a matter of law." *Hale ex rel. Hale v. City of Jefferson*, 6 S.W.3d 187, 192 (Mo.App. W.D.1999) (citing *ITT*, 854 S.W.2d at 377). We review the record in the light most favorable to the party against whom summary judgment was entered. *ITT*, 854 S.W.2d at 376. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record." *Id.* (citations omitted).

## B. Analysis

The claims made by Park Range in its third point are very similar to those asserted in its first point. As we already concluded in our discussion of point one, the language of the contracts clearly and unambiguously distinguished "equipment and tools" from "products." The contracts contained no provision restricting Atlas's ability to sell products. The only disputed "facts" Park Range points to are the testimony regarding Park Range's intent to create an exclusive territory for product sales, and the parties' disagreement over the meaning of the terms equipment, tools, and products.

 Park Range's first assertion of disputed fact is problematic in that an unambiguous contract leaves no room for the admission of extrinsic evidence of intent. Therefore, this testimony cannot provide the basis for a disputed fact that would preclude summary judgment. Moreover, the parties' disagreement about the interpretation of terms in the contracts is not a dispute of fact but a question of law properly decided by the trial court. Because there is no genuine dispute of material fact raised by points three or four and we have already interpreted the contract in a manner which entitles Atlas to judgment as a matter of law, Park Range's third and fourth points are denied.

In its final point, Park Range claims that the trial court erred in granting summary judgment because the termination of an at-will distributorship agreement supports a claim for breach of the implied covenant of good faith and fair dealing and that Park Range's claim involves disputed issues of material fact. In response to Park Range's second point, we concluded that, as a matter of law, an at-will distributorship agreement does not support a claim for a breach of an implied covenant of good faith and fair dealing. Park

Range has not disputed the fact that the Denver contract was an at-will distributorship agreement. Thus, there is no genuine dispute of material fact, and Atlas is entitled to judgment as a matter of law on Park Range's breach of the implied covenant of good faith and fair dealing counterclaim.

## Conclusion

The contracts entered into by Atlas and Park Range are clear and unambiguous, therefore precluding the admission of extrinsic evidence regarding intent. While the contracts do prohibit Atlas from selling equipment and tools within certain geographic areas, there is no equivalent provision restricting Atlas's ability to sell products. As an at-will distributorship agreement, the Denver contract does not support a defense or counterclaim based on a breach of an implied covenant of good faith and fair dealing. The trial court's rulings in its declaratory judgment and grant of summary judgment are affirmed.

All concur.