

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| MODIVCARE SOLUTIONS, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF ADMINISTRATION, et al., | ) | WD86090 |
| | ) | |
| | ) | OPINION FILED: |
| Respondents, | ) | January 16, 2024 |
| and | ) | |
| | ) | |
| MEDICAL TRANSPORTATION MANAGEMENT, INC., | ) | |
| | ) | |
| Intervenor/Respondent. | ) | |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable J. Hasbrouck Jacobs, Judge**

**Before Division Three:** Lisa White Hardwick, Presiding Judge, and
Karen King Mitchell and Cynthia L. Martin, Judges

ModivCare Solutions, LLC (ModivCare) appeals the trial court's judgment in

favor of respondents, the Office of Administration for the State of Missouri and its

Division of Purchasing and Materials Management (OA), on ModivCare's petition

challenging OA's award of a contract for non-essential medical transportation services to

another bidder, Medical Transportation Management, Inc. (MTM). ModivCare raises one point of error: that the trial court erred in failing to find that the OA evaluators acted unlawfully or abused their discretion when applying the Request for Proposal's adjectival ratings to the bids submitted by ModivCare and MTM because the evaluators substituted "guesswork" and "used an unfair and inconsistent process" resulting in ModivCare's losing the contract to MTM. Finding no merit in ModivCare's argument, we affirm.

## Background[1]

On December 23, 2021, OA issued its Request for Proposals No. 30034902200493 (RFP), inviting vendors to submit competitive, sealed proposals to provide brokered non-emergency medical transportation (NEMT) services for several Missouri agencies, including the Department of Mental Health and MO HealthNet Division. The successful bidder would provide or arrange for the provision of transportation to non-emergency healthcare appointments for Medicaid recipients. At that time, ModivCare was the vendor providing those services to the state under a contract awarded in 2016, which would expire on November 30, 2022. The new contract would run from its effective date through June 30, 2027. Several potential vendors, including ModivCare and MTM, bid under the RFP. On May 25, 2022, the contract was awarded to MTM. ModivCare submitted a bid protest, which was denied by OA on August 31, 2022. ModivCare filed a petition for judicial review in the Cole County Circuit Court on September 23, 2022, but

---

[1] "We review the evidence in the light most favorable to the trial court's judgment and defer to the trial court's credibility determinations." *Harris v. Harris*, 655 S.W.3d 33, 38 (Mo. App. W.D. 2022).

no temporary restraining order or preliminary injunction was sought to prevent the transition of the NEMT contract. On December 1, 2022, MTM began providing NEMT brokerage services pursuant to the contract awarded under the RFP. Following a bench trial, ModivCare's challenge to the award of the contract was denied, and ModivCare appeals.

The RFP explained that bids would be evaluated based on three categories: "Cost Proposal," "Technical Proposal," and "MBE-WBE Participation" (MBE-WBE standing for "Minority Business Enterprise/Women Business Enterprise"). Both the "Cost Proposal" and "MBE-WBE Participation" categories were to be scored objectively.

The "Technical Proposal" category was to be scored subjectively, by an evaluation committee, according to the evaluation criteria in § 4.6.2 and Attachment 21 of the RFP, which provided five defined "adjectival ratings" as possible scores: Distinctive, Superior, Satisfactory, Marginal, and Unsatisfactory. Each category described the characteristics necessary to achieve that rating and the numerical score associated with it. Attachment 21 provided three sub-categories for "Technical Proposal": (1) "Proposed Methodology, Approach, and Work Plan"; (2) "Vendor Personnel Qualifications"; and (3) "Past Performance." This appeal concerns only the third sub-category ("Past Performance"), which contains two sub-categories ("Overall Relevant Vendor Experience" and "Case Studies"). These sub-categories were evaluated using the following adjectival definitions in Attachment 21 (no separate definitions were given for "Overall Relevant Vendor Experience"):

**Scoring of Past Performance**

The state will assess the Vendor's Past Performance based upon the adjectival categories in Table 5:

| TABLE 5 | |
|---|---|
| **CASE STUDY/REFERENCE** | |
| **Rating** | **Definition** |
| **Distinctive** | Past performance was recent and involved essentially the same scope and magnitude of effort and complexities required in this RFP. Reference indicated past performance significantly exceeded overall requirements and expectations; delivered significant and/or innovative impact. |
| **Superior** | Past performance was recent involved similar scope and magnitude of effort and complexities required in the RFP. Reference indicated past performance exceeded requirements on some dimensions. |
| **Satisfactory** | Past performance was relatively recent and involved some of the scope and magnitude of effort and complexities required in the RFP. Reference indicated past performance met minimum requirements. |
| **Marginal** | Past performance met requirements, but only after significant extra effort, significant delay, significant scope revisions were found necessary, and/or other adverse factors. |
| **Unsatisfactory** | Past performance is not relevant to the requirements in the RFP, or resulted in failed project/work due to mainly to the fault of the vendor. |

The adjectival rating for each Past Performance Reference Case Study will have a point value as shown in Table 6:

**REVISED PER ADDENDUM 01**

| TABLE 6 | | | | | |
|---|---|---|---|---|---|
| | **Distinctive** | **Superior** | **Satisfactory** | **Marginal** | **Unsatisfactory** |
| Overall Relevant Vendor Experience | 30 | 25 | 18 | 10 | 0 |
| *Case Studies* | *15* | *11* | *8* | *4* | *0* |

The RFP required the evaluators to compare the information in each vendor's bid with the adjectival ratings' definitions to determine the vendor's rating in that category, from "Distinctive" to "Unsatisfactory," measuring each bid against those standards. The RFP did not provide for a bid to be compared with any other vendor's bid.

Section 4.10.1 of the RFP instructed that each vendor should provide its "overall relevant experience and three (3) past performance case studies" regarding the vendor's work within the past three years. In completing the "past performance case studies," vendors were instructed to "summarize the project's context, objectives, approach, and impact achieved relevant to this RFP." In addition, each case study should "include the

4

name and contact information for a client representative who can speak to the scope, quality, and impact of the vendor's work." However, the RFP also told vendors that "[t]he State of Missouri may or may not contact these references during the review process. . . ." The RFP's "Terms and Conditions" provided that "[w]hen evaluating a proposal, the State of Missouri reserves the right to consider relevant information and fact, whether gained from a proposal, from a vendor, from vendor's references, or from any other source." The RFP provided the following directions regarding the vendor's production of information in the case studies:

> Directions to Vendor: The vendor should provide three (3) past performance reference case studies. Each should have been completed in the past three (3) years. At least two (2) should involve work for a state agency of similar scale and complexity as the MO HealthNet Division. The vendor should copy and complete this Exhibit for each case study presented. The three (3) case studies should represent the vendor's most relevant and recent experience that most closely aligns with the vendor's services proposed herein.

Both ModivCare and MTM submitted bids and received the "Superior" rating for "Past Performance." The evaluators did not contact any client representatives for ModivCare, MTM, or the other two vendors who submitted bids, nor did the evaluators compare the bids against each other. In their bids, ModivCare presented three case studies (from Oklahoma, Maine, and West Virginia) and MTM presented three case studies (from the District of Columbia, Nevada, and Missouri (for United HealthCare of

5

Missouri))[2] in support of their past performance scores.  OA and MTM do not dispute that ModivCare is a larger company with more nationwide experience than MTM.

The scoring of bids was done by a committee comprised of three evaluators.  A maximum of 218 points was available under the RFP, with 45 points allocated to "Past Performance."  Of those 45 points, 30 were allocated to "overall relevant vendor experience" and 15 to "case studies."  The committee determined that ModivCare earned "Superior" ratings for both overall experience and case studies, resulting in a "Superior" rating for "Past Performance" based on a total of 36/45 points (25/30 points for "overall relevant vendor experience" and 11/15 points for "case studies").  MTM received the same "Past Performance" scores and earned the "Superior" rating in that category.

A Procurement Supervisor with OA's Division of Purchasing prepared a narrative report (Report) explaining how the various bids were scored.  Although she sat in on meetings with the evaluators and took notes, the Procurement Supervisor was not a member of the evaluation team and did not personally score the bids.  The Report explained ModivCare's rating in past performance as follows:

---

[2] United HealthCare of Missouri is a third-party, Medicaid-managed care organization providing services to the state.  Consistent with the perimeters provided in the RFP's directions to vendors providing information about past performance under the RFP, two of MTM's case studies involved work performed for state agencies, while all three of ModivCare's case studies involved work performed for state agencies.

| ModivCare Solutions, LLC | | | |
|---|---|---|---|
| Element | Adjectival Rating | Score | Rationale to support the rating/score. Simple explanation justifying the rating/score given. |
| **Overall Relevant Vendor Experience** | Superior | 25 | ModivCare has been providing NEMT services for 26 years and has been providing NEMT services for the State of Missouri more than 15 years. Currently, ModivCare is providing NEMT services for 15 state-based programs totaling 48 million trips annually. |
| **Case Studies** | Superior | 11 | The first case study was where ModivCare provided NEMT services for the Oklahoma SoonerRide Non-Emergency Medical Transportation program since 2003 and provided annually on average 1.7 million trips and service to 780,000 members. The second case study was where ModivCare provided NEMT services for State of Maine Non-Emergency Medical Transportation Services since 2013 and provided annually on average 2.2 million trips and services to 166,000 members. The third case study was where ModivCare provided NEMT services for West Virginia Department of Health and Human Resources NEMT since 2018 and provided annually on average 2.1 trips and served 490,000 members. Past performance was recent and involved similar scope and magnitude of effort and complexities required in the RFP. |
| | **TOTAL POINTS** | 36 | |

The Report explained MTM's rating in past performance as follows:

| Medical Transportation Management, Inc. (MTM) | | | |
|---|---|---|---|
| Element | Adjectival Rating | Score | Rationale to support the rating/score. Simple explanation justifying the rating/score given. |
| **Overall Relevant Vendor Experience** | Superior | 25 | MTM has been providing brokered NEMT services, including call center operations for more than 25 years and currently provides transportation services for many managed care organizations within the State of Missouri. Additionally, previously MTM provided the state agency's brokered NEMT services for nine years. Currently, MTM is providing NEMT services for 29 state-based programs totaling 13 million trips annually. |
| **Case Studies** | Superior | 11 | The first case study was where MTM provided NEMT services for the District of Columbia since 2007 and provided annually on average 512,000 trips and service to 113,000 members. The second case study was where MTM provided NEMT services for Nevada Division of Health Care Financing and Policy since 2016 and provided annually on average 1.5 million trips and services to 700,000 members. The third case study was where MTM provided NEMT services for United HealthCare of Missouri since 2017 and provided annually on average 41,000 trips and served 250,000 members. Past performance was recent and involved similar scope and magnitude of effort and complexities required in the RFP. |
| | **TOTAL POINTS** | 36 | |

The Report contained several typographical errors, including that MTM was "providing NEMT services for 29 state-based programs."[3]  However, although MTM had provided "services" in twenty-nine states, not all those services were provided to state-based programs.[4]  The Procurement Supervisor acknowledged that this was her mistake and that the Report did not accurately reflect the information provided by the evaluators.  The trial court found that no evidence showed the evaluators "were under any misconception concerning the relative size of ModivCare and MTM's operations," with ModivCare providing more services nationwide, and that the typographical error in the drafting of the Report did not have any impact on the evaluators' subjective scoring of the proposal.

An attachment to the RFP showed a sample size of annual NEMT trips for MO HealthNet at slightly less than 1.1 million (1,094,108) in 2021, although the RFP estimated the annual number of trips needed as 1.6 million.  ModivCare and MTM are two major providers of NEMT brokerage services nationally.  The above "Past Performance" tables represent the total number of annual trips provided by MTM at 13 million trips and ModivCare at 48 million trips.  The case studies submitted by ModivCare and MTM as part of the RFP process indicated that each provided services that would fulfill the requirements of the RFP.  ModivCare provided an average in excess of 1.6 million annual trips to the three state-based programs included in its case studies.

_____

[3] A "state-based" program is a state Medicaid agency, such as MO HealthNet.
[4] The Report accurately noted the number of state-based programs served by ModivCare as 15 and did not mention that ModivCare provides services in all 50 states.

8

In its three case studies, MTM provided an average of 1.5 million annual trips in Nevada, 512,000 annual trips in the District of Columbia, and 41,000 annual trips for United HealthCare in Missouri.

The trial court found that not only was the "Past Performance" category evaluated subjectively, but the "Past Performance" definitions for the ratings (Distinctive through Unsatisfactory) were "broadly written and gave the evaluators considerable leeway over how to score proposals." All three evaluators worked for either the Division of Social Services (of which MO HealthNet is a department) or the Department of Mental Health, the two state agencies that would receive the services sought by the RFP. Regarding the scoring of the ModivCare and MTM "Past Performance" submissions, the record does not indicate whether or not evaluators compared the specific numbers in each vendor's case studies to the numbers required to provide the RFP's services when determining each vendor's rating.

In the final point tally, MTM was scored 8.13 points higher than ModivCare (175 to 166.87). The difference resulted from MTM proposing a lower cost and receiving higher scores for its provision of sheltered workshops and organizations for the blind, and thus MTM was awarded the contract. The point margin was slim enough that, had ModivCare received a higher rating ("Distinctive") and/or MTM a lower one ("Satisfactory") in the past performance category, ModivCare would have earned the most points and gotten the contract.

The trial court found that the two evaluators who testified at trial "provided coherent, well-reasoned explanations for why they scored ModivCare and MTM as they

did" and that "the facts in each proposal" provided a "defensible rationale for scoring ModivCare and MTM as 'Superior' on both Past Performance elements." ModivCare appeals, challenging the scoring of the Past Performance portion of the RFP.[5]

**Analysis**

ModivCare raises one point of error: that the trial court erred in failing to find that the OA evaluators acted unlawfully or abused their discretion when applying the adjectival ratings to the bids submitted by ModivCare and MTM because the evaluators substituted "guesswork" and "used an unfair and inconsistent process" resulting in ModivCare losing the contract to MTM.

### I.  Alleged Briefing Deficiencies and the Standard of Review

Before we reach ModivCare's allegation of error, we must address the argument of respondent OA and intervenor MTM that ModivCare's brief violates Rule 84.04[6] in several respects and therefore ModivCare's appeal should be dismissed. We agree that ModivCare's Point Relied On does not use the precise formula suggested by Rule 84.04(d)(1). However, ModivCare's brief explains its argument, and the responsive briefs indicate that the point of error was understood. When "the issues and questions are clear," we will rule on the merits even if there are deficiencies in a point relied on. *Jos. A. Bank Clothiers, Inc. v. Brodsky*, 950 S.W.2d 297, 302 (Mo. App. E.D. 1997). Likewise, ModivCare's statement of facts does not warrant dismissal of its appeal. Because "meaningful appellate review is possible" and because respondents have

---

[5] We will address additional facts as needed during our analysis.
[6] All rule references are to the Missouri Supreme Court Rules (2023).

10

supplemented the facts with their own statements, we have discretion to review the appeal despite any deficiencies in the appellant brief's statement of facts, and we choose to do so here. *See Almat Builders & Remodeling, Inc. v. Midwest Lodging, LLC*, 615 S.W.3d 70, 76 n.4 (Mo. App. E.D. 2020).

Our review of an appeal from the judicial review of a non-contested administrative decision, like this one, is the same as that for any other judgment in a court-tried case: we review the trial court's decision, not the decision of the administrative agency. *State ex rel. Christian Health Care of Springfield, Inc. v. Mo. Dep't of Health and Senior Servs.*, 229 S.W.3d 270, 275 (Mo. App. W.D. 2007). In court-tried cases, we affirm the judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law," thus affording deference to the court's findings of fact. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

While ModivCare's Point Relied On properly identifies the trial court's judgment as the subject of our review, the Point Relied On does not indicate upon which of the *Murphy* bases of trial court error it is relying. However, in the argument portion of its brief, ModivCare asserts that the trial court misinterpreted the RFP. And, in its reply brief, ModivCare disavows any reliance on a challenge to the sufficiency or the weight of the evidence. Therefore, we will read ModivCare's claim of error as limited to a claim that the trial court erroneously declared or applied the law in interpreting the RFP.

11

While ModivCare is correct that "[a] trial court's construction of [a] contract involves legal conclusion[s] . . . and this court need not give deference to the trial court's interpretation," *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City of St. Louis*, 947 S.W.2d 505, 506 (Mo. App. E.D. 1997) (calling for *de novo* review), to the extent that fact findings are relevant to the interpretation of the RFP's terms, we defer to the trial court's findings of fact.

## II. The trial court did not err in finding that the proposals were properly evaluated according to the RFP's terms.

ModivCare argues that the trial court erred in not finding that the NEMT contract was improperly awarded under the terms of the RFP, in that: (1) the evaluators failed to properly apply the first sentence of the adjectival category definitions of "Superior" to determine whether MTM's past performance was "recent" and involved "essentially similar scope and magnitude of effort and complexities" as required by the RFP; (2) the evaluators failed to apply the second sentence of the adjectival category definitions for "Distinctive" and "Superior" because the second sentence of each definition required that the evaluators contact individual references identified in case studies provided by the bidders if they were going to apply the criteria set out in the second sentence; and (3) the process used by the evaluators was unfair in that they did not rely on consistent data points when evaluating different bidders' proposals. For ease of analysis, we will address these claims out of order.

**a. The trial court did not err in failing to find that the second sentence of the adjectival category definitions for "Distinctive" and "Superior" required the evaluators to contact individual client representatives identified in case studies provided by the bidders in order to assess the bidders' past performance.**

The second sentence of the adjectival definition for "Distinctive" states, "Reference indicated past performance significantly exceeded overall requirements and expectations; delivered significant and/or innovative impact." The second sentence of the adjectival definition for "Superior" states, "Reference indicated past performance exceeded requirements on some dimensions." The RFP required bidders to identify client representatives in each case study, but expressly stated that evaluators were permitted, but not required, to contact those client representatives to obtain more information. It is undisputed that the evaluators did not contact any client representatives when evaluating the bids responding to the RFP at issue in this case. The evaluators relied on information in the case studies provided by the bidders and not comments from client representatives identified therein in assessing the criteria set out in sentence two.

There was testimony at trial that ModivCare's past performance was rated "Superior" rather than "Distinctive" because the information in its proposal did not permit the evaluators to conclude that ModivCare had "delivered significant and/or innovative impact" under its prior contracts. The trial court found this testimony credible and that the record as a whole supported giving ModivCare a "Superior" rating. ModivCare argues that the trial court erred in not finding that the evaluators acted unlawfully or abused their discretion in giving it a "Superior" rating because the use of the word "reference" in the second sentence of both definitions referred to client

13

representatives, not case studies, and thus if the evaluators elected not to contact client representatives they could not apply the criteria set out in the second sentence, which, as stated above, was the basis for not giving ModivCare a "Distinctive" score.

Central to this question is what is meant by the word "reference" as used in the second sentence of the adjectival category definition for "Distinctive" and "Superior" in the RFP. The RFP is subject to the rules of contract construction because, although the RFP was not itself a contract, it was an offer to vendors to submit proposals that was accepted when a bid proposal was made. *See Jackson Cnty. v. McClain Enters., Inc.*, 190 S.W.3d 633, 640 (Mo. App. W.D. 2006) (employing principles of contract construction in finding ambiguity in an offer to arbitrate before a particular judge); *see also Sayer v. Minn. Dep't of Transp.*, 790 N.W.2d 151, 157 (Minn. 2010) (holding that, "[a]lthough an RFP is not an offer to enter into a contract, RFPs are generally construed using traditional principles of contract interpretation") (citing *Vanguard Sec., Inc. v. United States*, 20 Cl. Ct. 90, 103 (1990) (holding that contract construction principles "appl[y] to interpretation of a solicitation")).

"If the language of a contract is unambiguous, the intent of the parties will be gathered solely from the terms in the contract." *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 860 (Mo. banc 2006). "A contractual provision is not ambiguous merely because the parties disagree over its meaning." *Armstrong Bus. Servs., Inc. v. H & R Block*, 96 S.W.3d 867, 874 (Mo. App. W.D. 2002). Ambiguity results when the contract's "terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." *Id.* A contract's terms must be construed to "avoid

14

rendering other terms meaningless." *Schneider*, 194 S.W.3d at 860 (quoting *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003)).

The term "reference" is not defined by the RFP but appears in it multiple times. Section 4.10, "Evaluation of Past Performance," contains a boxed paragraph entitled "Directions to Vendor," instructing vendors to "provide three (3) past performance *reference*[7] case studies"; thereafter, the paragraph refers to "case studies" but not specifically to "references." Table 5, containing the adjectival definitions for "Past Performance," is labeled "CASE STUDY/REFERENCE." The definitions for "Distinctive," "Superior," and "Satisfactory" state, "*Reference* indicated past performance [met the stated qualifiers for the specific definition]." Section 4.10.1 instructs vendors to include contact information for a "client representative," then states that these "*references*" may or may not be contacted. Section 4.3.1(c), concerning confidentiality of information supplied by vendors, includes "client lists, *references*, proposed personnel, and methodology including schedule of events and/or deliverables." Section 8.g. provides, "When evaluating a proposal, the State of Missouri reserves the right to consider relevant information and fact, whether gained from a proposal, from a vendor, from vendor's *references*, or from any other source."

Reviewing the question of ambiguity *de novo*, we find that the term "reference" as used in the RFP is ambiguous. The RFP's use of the term "reference," in the context of

---

[7] Throughout this paragraph, the word "reference" is italicized when it appears in language quoted from the RFP. We do this to draw attention to the RFP's repeated use of the word reference, although it is not italicized in the RFP.

the Table 5 definitions for the "Past Performance" ratings, is easily susceptible of two meanings: (1) "case studies," as argued by OA and MTM; and (2) "client contacts" identified in the case studies, as argued by ModivCare. Each side of this argument presents context in the RFP that supports their argument. For example, OA and MTM note that the RFP's instructions for completing the case studies refers to the case studies to be provided as "*reference* case studies." In contrast, ModivCare points to the case study instructions that state, "The case study should include the name and contact information for a client representative who can speak to the scope, quality, and impact of the vendor's work. The State of Missouri may or may not contact these *references* during the review process." (emphasis added).

Both interpretations have some merit. But perhaps most important to our analysis is that, because the RFP expressly gives the evaluators the discretion not to contact client representatives, if we read the RFP as ModivCare suggests (that "reference" unambiguously means client representatives) and if the evaluators exercise their discretion not to contact client representatives, one of the two criteria for evaluating past performance (the quality of the examples of past performance set out in the RFP) is rendered inapplicable, and thus meaningless. In other words, if we read the word "reference" as ModivCare suggests, the RFP would require bidders to provide case studies of past contracts, but those case studies could be ignored and past performance could be evaluated based exclusively on the first sentence of the "Distinctive" and "Superior" definitions (which simply requires the evaluators to consider whether the past performance of the bidder was recent and involved the same or similar scope and

16

magnitude of effort and complexity required by the RFP, without any consideration of how successful that past performance was) if the evaluators exercised their discretion to not contact client representatives.

ModivCare argues that "reference" cannot be read as OA and MTM suggest (as referring to the case studies) because to do so would not give the evaluators sufficient information to evaluate the bids.[8] But we find the opposite to be true. The RFP expressly requires a bidder to include three case studies in its proposal. The RFP also provides guidance as to what information the vendor should include in its case studies: "The vendor should summarize . . . the past project's context, objectives, approach and impact achieved relevant to this RFP." This provides the bidder with the opportunity to explain how its past performance met or exceeded expectations and provided impact for the client. This information equates with the factors laid out in the second sentence of the adjectival definition for "Distinction" and "Superior" past performance. While the evaluators may go a step further and verify the bidder's representations by contacting client representatives, they are not required to do so and may use the information provided by the bidder to perform their evaluation. Therefore, if the term "reference" is read as OA and MTM suggest, the evaluators have information from which they can assess a bidder's compliance with the criteria set out in the second sentence of the past performance adjectival definition. But, if "reference" is read as ModivCare suggests, the

---

[8] We note that ModivCare does not assert how it was affected by the evaluators' decision not to contact client representatives or that it withheld information from its proposal that would have been supplied by those representatives, nor does it disclose what its client representatives would have told the evaluators had they been contacted.

17

evaluators are either mandated to contact client representatives (in contravention of the terms of the RFP) or they must assess past performance without considering the bidder's previous level of success.

The trial court considered and found credible testimony that OA routinely treated the word "reference" in RFPs as referring to case studies and not to the comments of client representatives.[9]  ModivCare argues that the trial court erred in considering parol evidence as to the meaning of the term "reference" in the second sentence of the adjectival definitions of "Distinctive" and "Superior" because the term was not ambiguous and, even if it were, the trial court never made a finding of ambiguity.  We have already concluded that "reference" as used in the RFP was ambiguous.  As to the trial court's failure to make a finding of ambiguity, its reliance on such testimony impliedly makes that finding.  ModivCare cites no authority to support the argument that there must be an express finding of ambiguity, and we have found none.  Even if a trial court should make a finding of ambiguity before allowing into the record and relying upon parol evidence, "[i]f the judgment is properly sustainable on other grounds, the judgment must be affirmed."  *Doe v. St. Louis Cmty. Coll.*, 526 S.W.3d 329, 335 (Mo. App. E.D. 2017) (quoting *Hulse v. Warren*, 777 S.W.2d 319, 322 (Mo. App. S.D. 1989)).  Because we agree with the judgment and because ModivCare does not challenge that there was factual support for the finding that OA routinely interpreted the term

---

[9] An OA representative testified that the terms "reference" and "case study" were interchangeable and that OA had recently introduced the term "case study" when previously OA had called that study a "reference."

"reference" in RFPs to mean case studies, we find no error in the trial court's considering parol evidence.

We reject ModivCare's argument that the trial court erred in not finding that the evaluators acted unlawfully and abused their discretion in applying the second sentence of the adjectival definition of "Distinctive" and "Superior."

b. **The trial court did not err in not finding that the evaluators failed to properly apply the first sentence of the adjectival definitions of "Superior" in scoring MTM's past performance.**

Both ModivCare and MTM received a "Superior" rating on the past performance portion of their bid proposal in response to the RFP for NEMT brokerage services. The first sentence of the adjectival definition of "Superior" reads, "Past performance was recent [and] involves similar scope and magnitude of effort and complexities required in the RFP." ModivCare argues that the evaluators misapplied this sentence in evaluating MTM's bid proposal and that, if the evaluators had properly interpreted and applied the requirements of the first sentence, MTM would have received a "Satisfactory" rating.[10] The first sentence of the "Superior" definition requires the evaluators to consider whether

---

[10] ModivCare also argues that, had the evaluators properly interpreted and applied the first sentence of the adjectival definition of "Distinctive," it would have received the higher rating. We need not reach this issue. As discussed above, there was testimony that the evaluators did not give ModivCare a "Distinctive" rating because ModivCare's bid proposal did not demonstrate that it met the second sentence of the "Distinctive" definition. The trial court found this testimony credible. ModivCare's only challenge to the application of the second sentence is the proper interpretation of the term "reference." As addressed above, we reject ModivCare's argument about the meaning of "reference." Because there was a basis under the second sentence of the definition of "Distinctive" to deny ModivCare that rating, we need not address whether ModivCare met the definition of "Distinctive" under the first sentence.

19

the bidder's proposal indicated that its past performance was (1) recent and (2) similar in scope and magnitude of effort and complexity as that required in the RFP.

In considering ModivCare's claims, the trial court noted that the scoring of the past performance category was subjective, giving the evaluators discretion. The trial court also found that the adjectival definitions were broadly worded, thus giving the evaluators "considerable leeway" in determining the bidder's rating for past performance.

MTM submitted information about its overall relevant experience and three case studies in its bid proposal. Although the RFP did not expressly define "recent," it directed bidders to include cases in their case studies regarding the vendor's work within the past three years. All three of MTM's case studies addressed work it performed within three years of the bid and thus MTM's bid proposal reflected "recent" performance. The question then is whether MTM's bid proposal indicated that its past performance was similar in scope and magnitude of effort and complexity as that required in the RFP. Only one of the three case studies provided by MTM had annual trip numbers similar to those expected under Missouri's NEMT program. MTM submitted case studies for state-based programs in Nevada, with average annual trips of 1.5 million, and Washington, D.C,[11] with average annual trips of 512,000. MTM also provided a case study for its work for the third-party contractor United HealthCare that operated in Missouri, for which MTM averaged 41,000 annual trips. MTM's bid proposal also

_____

[11] Obviously, Washington, D.C., is not a state, but in providing Medicaid services, its government performs the same function as a state. Therefore, MTM's NEMT contract in Washington, D.C., is similar to a state-based contract.

reflected that it provided state-based services in 8 states and related services in a total of 29 states.

In arguing that MTM's bid proposal did not indicate that its past performance was similar in scope and magnitude of effort and complexity as that required in the RFP, ModivCare advocates for a "numerical comparison" that requires the "evaluators' scoring process to include a comparison of numerical data to determine the size and quantity of each vendor's 'recent' . . . experience and case studies matched the size and quantity of the RFP services." We do not disagree that it makes sense that, in determining whether a bidder's past performance was similar in scope and magnitude of effort and complexity as that required in the RFP, the evaluators would look at the size of the bidder's previous contracts based on number of clients served and trips provided. But the evaluators certainly could consider other information as well. In preparing the case studies for the bid proposal, bidders were directed to address the following as part of their "Overall Relevant Vendor Experience":

> Experience as a broker
> Experience providing Non-Emergency Medical Transportation Services
> Experience in managing a call center
> Experience in maintaining eligibility requirements for services
> Experience managing and auditing transportation providers as a broker
> Experience handling grievances
> Experience handling transportation provider complaints and appeals

These non-numerical factors are relevant to comparing scope and complexity of past performance to the services required under the RFP. It is not surprising that ModivCare would advocate for a purely numerical analysis that would favor larger bidders, since it is the largest provider of NEMT services nationally. But the RFP does

not require the evaluators to compare bidders to one another, nor is it designed to award the contract to the largest or most experienced bidder.

Although not expressly stated, ModivCare's argument appears to be based on the assumption that a bidder can only legitimately receive a "Superior" score if *each* of the case studies it provided in its bid proposal involved contracts for a numerically similar level of service. But there is nothing in the RFP or the definitions that requires that all case studies be the same size or even that including fewer than three case studies would disqualify a proposal. The trial court heard testimony that, in evaluating the bid proposals, the evaluators were attempting to determine that a bidder's past experience indicated it could successfully perform the requirements of the RFP. A single case study could be similar enough in scope and magnitude of effort and complexity to reflect that the bidder was capable of performing the requirements of the RFP and thus deserved a "Superior" rating. As one evaluator put it, both ModivCare and MTM had "enough experience" to be considered equal contenders for the work.

ModivCare picks apart each of MTM's case studies, but the fact remains that MTM presented at least one case study (from Nevada) that was numerically similar in scope and magnitude so as to fit the "Superior" rating. It was within the evaluators' discretion to view the past performance criteria as designed to ensure that an applicant's past performance reflected that it was capable of meeting the requirements of the RFP. In conducting judicial review of a non-contested administrative case, a court is limited to determining if the agency's decision was "unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion." *BG Olive & Graeser, LLC v.*

22

*City of Creve Coeur*, 658 S.W.3d 44, 47 (Mo. banc 2022) (quoting § 536.150.1).  The

trial court was prohibited from substituting its discretion for discretion legally vested in

the administrative body.  *Id.* at 48 (quoting § 536.150.1).  Because the record supports the

trial court's findings that the evaluators did not act unlawfully or abuse their discretion in

applying the first sentence of the adjectival definition of "Superior" in the subjective past

performance criteria of the RFP, we find no error.

### c. The trial court did not err in rejecting ModivCare's argument that the process used by the evaluators was unfair in that they did not rely on consistent data points when evaluating different bidders' proposals.

ModivCare argues that the evaluators relied on different data points in evaluating

different bidders' proposals.  In support of this argument, ModivCare cites the testimony

of one evaluator that the team may not have thought that the same data points were

important on different days and that she did not recall there being discussions to make

sure the same data points were used in the Report.  But the only *data point* that

ModivCare identifies as being inconsistently applied in the Report is the number of

state-based programs for which it and MTM provided services and the number of states

where each provided NEMT services.

First, it is important to note that the Report was prepared to memorialize what was

done in the evaluation process.  The Report was prepared by the OA Procurement

Supervisor after the evaluation committee met, and thus there is no evidence that the

mistake in reporting this data point in the Report in any way affected the award of the

NEMT contract.  The Report did incorrectly state that MTM provided "NEMT services

for 29 state-based programs" when in reality MTM provided NEMT services in 29 states,

23

but in only eight states were the services provided as part of a state-based program. The same mistake was not made in addressing ModivCare's experience. The Report correctly indicated that ModivCare provided state-based services in 15 states but failed to mention that ModivCare provided NEMT services in all 50 states. The Procurement Supervisor, who was not one of the evaluators, acknowledged that this was her mistake and that the Report did not accurately reflect the information provided by the evaluators. The Report did correctly note the total number of trips provided by ModivCare and MTM. We defer to the trial court's finding that the procurement officer's testimony was credible and that no evidence showed the evaluators "were under any misconception concerning the relative size of ModivCare and MTM's operations," with ModivCare providing more services nationwide, and that the typographical error in the drafting of the Report did not have any impact on the evaluators' subjective scoring of the proposal.

ModivCare also relies on testimony that at least one evaluator considered relevant the fact that MTM provided services in Missouri (under a contract with the third-party provider). ModivCare argues that this was not a factor under the RFP and thus evidence that evaluators relied on this fact demonstrates that evaluators did not compare the information in the bids to the criteria set out in the RFP. While experience with Missouri is not part of the criteria set out in the RFP, it is not clear that considering that type of experience would fall outside the broad leeway allowed under the evaluators' subjective review. And, in any event, even if it should not have been considered, there is no evidence that considering experience in Missouri worked to ModivCare's disadvantage in the award of the contract. There is evidence that the evaluators were aware that

24

ModivCare was the current holder of the contract for NEMT brokerage services in Missouri. So, to the extent that the record supports the conclusion that the evaluators gave weight to Missouri-specific experience, there is no indication that this favored MTM over ModivCare.

Ultimately, the trial court properly found that, pursuant to § 536.150.1, it was "not permitted to set aside the contract award simply because it disagrees with the evaluators' subjective scoring decisions (a matter on which [it] expresses no opinion)." The trial court held that there was no abuse of discretion because the evaluators' exercise of their discretion did not result in a decision that was "clearly against the logic of the circumstances," nor was it "so arbitrary and unreasonable that it shocks the sense of justice." *See Banks v. Vill. Enters., Inc.*, 32 S.W.3d 780, 793 (Mo. App. W.D. 2000). We likewise find no reversible error in the trial court's judgment.

## Conclusion

ModivCare has failed to show error by the trial court in entering judgment for OA on ModivCare's petition. The trial court's order is affirmed.

_____
Karen King Mitchell, Judge

Lisa White Hardwick, Presiding Judge, and Cynthia L. Martin, Judge, concur.